UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: | CASE NO. |
| **BEECHGROVE REDEVELOPMENT, LLC** | **07-12057** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |
| **Jointly Administered** | |
| **BEECHGROVE REDEVELOPMENT PHASE II, LLC** | **07-12058** |
| | SECTION A |
| DEBTOR | CHAPTER 11 |

### REASONS FOR DECISION

On November 18, 2008, the Court heard the First Application for Compensation of First KT Lending, LLC ("First KT Lending") for Allowance of Fees, Costs, and Charges through September 30, 2008 ("the Application"). The Application includes of fees of counsel and consultants hired by both First KT Lending and its predecessor in interest, Regions Bank, f/k/a AmSouth Bank ("Regions") (collectively Regions and First KT Lending are referred to as "First KT"):

1. Reimbursement of professional fees of Chaffe McCall LLP ("Chaffe") in the aggregate amount of $150,469.15 incurred during November 21, 2006 through December 19, 2007 and reimbursement of out of pocket expenses advanced by Chaffe McCall LLP in the aggregate amount of $4,645.12 between November 21, 2006 and December 19, 2007.

2. Reimbursement of professional fees of Locke Lord Bissell & Liddell LLP ("Locke")in the aggregate amount of $301,831.50 incurred from February 1, 2008 through September 30, 2008 and reimbursement of out of pocket expenses advanced by Locke Lord Bissell & Liddell LLP in the aggregate amount of $16,351.67 between February 1, 2008 and September 30, 2008.

3. Reimbursement of professional fees of Adams and Reese LLP ("A&R") in the aggregate amount of $71,868.25 for the period beginning January 3, 2008 through April 28, 2008 and reimbursement of out of pocket expenses advanced by Adams and Reese LLP in the aggregate amount of $2,402.70 between January 3, 2008 and April 28, 2008.

4. Reimbursement of professional fees of Chiron Financial Advisors LLC ("Chiron") in the aggregate amount of $195,000.00 for the period beginning January 1, 2008 through September 30, 2008 and reimbursement of out of pocket expenses advanced by Chiron Financial Advisors in the aggregate amount of $821.43 between January 4, 2008 and September 30, 2008.

5. Reimbursement of out of pocket expenses of First KT in the aggregate amount of $37,729.45 for the period beginning January 1, 2008 through September 30, 2008.

**I. Basis for Approval of Attorneys' Fees**

When reviewing fees requested by counsel, the Fifth Circuit has long held that courts are to use a lodestar analysis.[1] *Johnson v. Georgia Highway Express, Inc.* sets forth twelve (12) factors to consider in awarding fees. They are:

(1) The time and labor required;
(2) The novelty and difficulty of the questions;
(3) The skill and requisite to perform the legal service properly;
(4) The preclusion of other employment by the attorney due to acceptance of the case;
(5) The customary fee for similar work in the community;
(6) Whether the fee is fixed or contingent;
(7) The time limitations imposed by the client or the circumstances;
(8) The amount involved and the results obtained;
(9) The experience, reputation, and ability of the attorneys;
(10) The "undesirability" of the case";
(11) The nature and length of the professional relationship with the client;
(12) Awards in similar cases.[2]

**A. Whether the Fee is Fixed or Contingent**

If a representation is contingent on the result obtained, counsel bears an additional risk of nonpayment. As a result, contingent fees may result in higher compensation as a balance against the additional risk. The fee arrangement between the secured note holder and its counsel was based

---

[1] *Johnson v Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

[2] *Id.* at p. 718-719.

on hourly rates and was not contingent on the result obtained. First KT's counsel has been paid as invoices were submitted. No increase is necessary for the risk of nonpayment.

### B. Benefit and Necessity of Services to Debtors, Amount Involved and Results Obtained

Section 330 requires that the services for which compensation is sought be both necessary and of benefit to debtors. The notes held by First KT require the borrower to pay all reasonable expenses associated with collection, including attorney's fees.

Counsel for First KT has asserted that through the efforts of its client, Beechgrove Redevelopment LLC and Beechgrove Redevelopment Phase II LLC ("Debtors") were able to confirm consensual plans. While this is true, most of the time expended by First KT was adversarial to Debtors. When considering a fee request for a professional retained by a secured creditor, the services rendered may not be fully supportive of the debtor. A borrower in bankruptcy is likely to experience a certain level of tension or disagreement with its prepetition lender. To properly evaluate the propriety of the fee request, the Court should determine if the services preformed were necessary and reasonable given the issues presented by the case.[3]

At the institution of this case, the notes owed by Debtors were held by Regions. Regions was represented by Chaffe. Chaffe had also represented Regions in connection with a prepetition foreclosure action against Debtors. Immediately after the filing, Chaffe performed the initial and typical services required to represent a lender. It reviewed the bankruptcy pleadings, including the schedules and statement of financial affairs, began its pursuit against guarantors and continued

---

[3] *Central Progressive Bank v. Bradley*, 502 So.2d 1017 (La. 1987); *Wuertz v. Tobias*, 512 So.2d 1209 (La.App. 5th Cir. 1987); and *City of Baton Rouge v. Stuaffer Chemical Co.*, 500 So.2d 397 (La. 1987).

monitoring Debtors' suit against its insurers. A review of the invoices submitted indicates that approximately $4,850.00 in time was expended in the initial review of Debtors' bankruptcy cases.[4]

In December 2007, Regions assigned its interest in the notes to First KT Lending. First KT Lending substituted its own counsel, A&R, on January 3, 2008.[5] As might be expected, A&R also conducted an initial review of Debtors' cases expending $6,702.00 in time reviewing schedules, statements of financial affairs, previously filed motions, orders transcripts of prior hearings.

Shortly after acquiring the First KT file, A&R discovered or developed a conflict of interest. On February 12, 2008, Locke was retained by First KT Lending as substitute counsel.[6] Not unlike A&R, on receiving the representation, Locke again reviewed the Debtors' filing documents, proofs of claim, transcripts of hearings, motions and orders previously entered. The Court estimates that $19,295.00 in time was expended for this purpose.[7]

While the time spent by A&R or Locke to familiarize themselves with the pleadings, hearings and ruling of the case might be justified from a professional perspective, the lender is not justified in passing these fees on to the estate. The services were a repetition of work already performed and incurred due to the transfer of the notes to First KT Lending as well as First KT Lending's decision

---

[4] Additional fees were charged for services in connection with the litigation of a postpetition financing request, use of cash collateral, motion for turnover and relief from the automatic stay.

[5] A&R formally appeared in the case on February 4, 2008.

[6] Locke formally enrolled in the case on Februrary 26, 2008.

[7] Included in the $19,295.00 figure is $9,124.50 in time reviewing the proof of claim previously prepared by A&R.

to change counsel. Because these services were a duplication of effort, the amount requested will be reduced by $25,997.00.

The transfer of the debt from Regions to First KT Lending also generated significant fees to effect the terms of the business transaction and preserve the rights of the new note holder. While Regions' counsel appears to have eliminated those charges from its bill, A&R billed over $11,893.00 in fees to effect the transfer. Additionally, $8,692.00 in fees was billed by A&R to prepare the file for transfer to Locke and respond to Locke's questions regarding the representation. Since these fees were expended without reference to collection or protection of collateral, they are also disallowed.

### C.  Time and Labor Required, The Skill of the Lawyer Involved and The Experience of Counsel

In determining the reasonableness of the fee, the hours spent by counsel and staff are relevant. In analyzing the time spent, the Court utilized the time breakdowns supplied by Locke at the hearing on the Application.[8] Those breakdowns attempted to divide the time claimed into broad categories of tasks. For example, according to Locke, A&R's invoices contain $12,602.00 or 49 hours of time for the preparation of First KT's proofs of claim. Four areas of service deserve adjustment based on the time expended.

#### 1. Preparation of Proofs of Claim

First KT filed two proofs of claim, one for each Debtor. The proof of claim for one debtor is six pages long and the other barely goes onto the seventh page. The first page of both claims is Official Form 10 with the appropriate boxes filled or checked. Both claims contain a nearly

---

[8] The Court also compared the time spent to that of other counsel in the case, in particular, Debtors' counsel.

identical narrative history of the loan with the next page listing the documents evidencing the loan or securing its repayment. The documents were filed as exhibits. The last page of both claims is a chart detailing the historical post-default interest rate and a calculation of accrued interest due.

The Court cannot fathom why counsel spent so much time preparing such a basic document, and the evidence offered failed to supply an explanation. The size of the bill appears to be a result of two partners preparing the claims at rates of $355.00 to $345.00 per hour. The documents which support this claim are fairly standard and the debt relatively uncomplicated. The preparation of a proof of claim secured by an apartment complex is the type of work that can properly be done by a mid-level associate and perhaps reviewed or proofed by a partner. The Court finds that 10 hours of time is adequate to prepare the proofs of claim filed in this case and will reduce the time allowed to $2,700.00.

### 2. Legal Research

Locke reported over 75 hours in legal research at a cost of $22,539.00 on its invoices. The description of the work performed is almost identical for every entry and reads, "Legal research re Debtor's ability to cram down secured lender." The research was performed by a lawyer billing at a rate of $310.00 per hour. The time expended is objectionable for at least two reasons. First, the issues researched are fairly routine in cases of this sort, and Locke failed to establish why the file required a lawyer at this billing rate. Second, Locke had at least two bankruptcy partners on the file at all times. One charged $270.00 per hour and the other $365.00. At these rates, the Court assumes that counsel is proficient with bankruptcy law and jurisprudence and 75 hours of research on routine issues is unnecessary. For these reasons, the charge for $22,539.00 contained in the Locke invoices is disallowed.

### 3. Time Spent in Litigation

Almost immediately after filing, Regions and Debtors began an intensive battle over the use of cash collateral, permission to incur postpetition financing and a request for turnover or relief from the automatic stay. Written and deposition discovery was perpetuated, motions, memoranda in support and opposition were filed, and a day of testimony was taken. While the work performed by Debtors' counsel and Regions' counsel were mirror images of each other, the fees charged were anything but similar. Chaffe expended $58,932.00 of time on these motions during the 30 day period following the petition date.[9] None of the attorneys utilized by Chaffe were experts in bankruptcy and significant time was expended in the education of counsel on the issues and defenses involved. Again, this might be acceptable if counsel billed at rates commensurate with their experience or lack thereof. Instead, the rates charged were between $275.00 and $430.00.

In contrast, the highest rate charged by Debtors' counsel was $350.00 per hour. In total, Debtors' counsel expended only $33,784.00 for prosecuting or defending the identical motions. Debtors' counsel are well known to the Court and have over thirty years of expertise in Chapter 11 reorganizations.

Given the level of expertise held by Debtors' counsel, the time expended on identical tasks and the rates authorized and customary in the District for this type of work, the Court cannot approve fees in excess of $33,784.00 for the tasks preformed. The invoices of Chaffe will be disallowed by $25,148.00 to effect this finding.

---

[9] Chaffes' time reviewing the bankruptcy case and pleadings, preparing the guarantor suit, and monitoring the insurance claim suit is not included in this figure.

### 4. Preparation of Pleadings

Finally, the time spent by A&R on the preparation of pleadings is worthy of review. A review of the docket sheet reveals that A&R filed only one pleading in the case during the time it represented First KT.[10] It was an objection to the application of insurance proceeds that highlighted various issues for the Court's consideration. It contained no citations to law and was not accompanied by a memorandum in support. A&R charged $10,992.00 to draft this pleading which the Court considers excessive. As a result, the fee will be reduced to $5,000.00.

### D. Timeliness of Services Performed

The services provided were performed in a timely manner and the case did not involve any unusual time constraints for counsel. Therefore, no reduction or increase in fee is required.

### E. Customary Fees Charged

As previously discussed, the average hourly market rate for chapter 11 representations is consistent throughout the District. The Court has approved fees:

| Counsel | Years of Bankruptcy Experience | Rate |
|---|---|---|
| AHG | 39 | 325 |
| DD | 33 | 350 |
| RPV | 33 | 350 |
| WS | 30 | 350 |
| JMH | 29 | 350 |
| RC | 29 | 320 |
| GM | 19 | 235 |
| AD | 19 | 225 |
| DW | 16 | 260 |
| WCB | 15 | 250 |
| TM | 12 | 325 |
| CC | 11 | 215 |
| JLO | 11 | 200 |

---

[10] A&R charged $10,992.00 to draft pleadings which the Court considers excessive.

| | | |
|---|---|---|
| LC | 10 | 210 |
| JDC | 8 | 240 |
| BK | 3 | 180 |

As the above chart illustrates, the highest rate allowed in the District for experienced bankruptcy counsel is $350.00 per hour.[11] Bankruptcy counsel with 15 to16 years of experience are allowed a rate of $275.00 per hour, while paralegals bill at $90.00 per hour.

Omer Kuebel and Victoria deLislic are New Orleans attorneys with 16 years of bankruptcy or lending law experience. Their rates on the Locke invoices range from $365.00-$375.00. Mr. Davin Boldissar, an associate with Locke who graduated eight years prior, bills at $310.00 per hour. Jason Cerise, an associate with only 5 years experience, invoiced First KT at $270.00 per hour. Paralegals were invoiced at $140.00 per hour. The rates at Locke's New Orleans office ranged between $140.00 and $375.00, well above that allowed in the District and unjustified in the Court's opinion.

At Chaffe, counsel billed at rates roughly commensurate with the standard rates in the District, except for Ms. Corrinne Morrison who charged $430.00 per hour and a few paralegals who billed at $105.00 and $115.00 per hour.

A&R invoiced Mr. Stoler at $440.00 per hour, but other counsel were billed at prevailing rates. However, paralegals were billed at $135.00 per hour.

To the extent not already reduced, the Court will reduce any time allowed at rates that exceed the District's standard rate. This results in a reduction of $44,043.50.

---

[11] The Court has allowed a rate of $375.00 in extraordinary cases.

### F. The Novelty or Complexity Of The Case

Chapter 11 work is more complex than other types of bankruptcy work, but the representation of a secured lender is usually not as difficult as that of a debtor or unsecured party. Because the Bankruptcy Code has built in protections for lenders and only a portion of the issues presented in a chapter 11 filing are relevant to the lender, the expense involved in representing a secured lender should be significantly less than that of debtor's counsel.[12]

While this case was litigious, the issues presented were typical of those found in most real estate chapter 11 proceedings. Disputes over the valuation of the collateral; accounting for the cash received and expenses incurred in the ordinary course of business; projecting future rents, occupancy rates and expenses; determining feasibility of a plan; and addressing postpetition financing were some of the major issues both Debtors' counsel and lender's counsel addressed.

In addition, Debtors' counsel was required to pursue insurance claims resulting from two separate, prepetition casualties, a fire and Hurricane Katrina. While these issues were handled by Debtors' counsel, First KT did monitor their progress in an effort to protect its rights to the proceeds. Issues regarding the obligations owed to HUD were also present. For this reason, the Court has not reduced the time charged by First KT's counsel for monitoring the insurance litigation, negotiating and litigating with Debtors regarding the application of insurance proceeds, or objecting to disclosure or confirmation of Debtors' two proposed plans. The Court has also allowed First KT's counsel the

---

[12] This is particularly so when debtor's counsel is highly competent and sophisticated.

rates charged with regard to prepetition services, specifically the foreclosure action filed in state court.[13]

### G. The Preclusion of Other Work

While this case involved much litigation, the firms did not allege that it precluded employment by other clients. Therefore, no adjustment to the fee is required.

### H. The Type of Attorney-Client Relationship And Whether Or Not It Is Long Standing

Lender chapter 11 work is generally for established clients who may receive preferred fee rates based on the volume of work or the total billings given a firm. In this case, it does not appear that counsel afforded either Regions or First KT a reduction in rate or billings due to existing relationships.

### I. Awards in Similar Cases

The reductions made from First KT counsels' statements results in a total fee award of $370,277.85. In comparison, Debtors' counsel expended $270,666.50 during the same period. If the Court omits the fees attributable to the prepetition foreclosure action ($80,668.00), the fees allowed to First KT still exceed those of Debtors' counsel.

The scope of Debtors' counsel's responsibility in this case was much larger than that of First KT. Debtors' counsel had a broader range of issues to address, drafted and filed two plans and disclosure statements, filed Objections and adversary complaints against lien and unsecured creditors, and filed many more pleadings or reports than First KT. Debtors' counsel was also responsible for the production of monthly financial reports to the Court and the U. S. Trustee; the

---

[13] For example, Chaffe charged over $80,000.00 in connection with the foreclosure action and $12,700.00 for monitoring the insurance case.

dissemination of the plan and ballots; and the presentation of expert witnesses on confirmation. In light of the above findings and this last conclusion, the Court considers the allowance of fees in the amount of $370,277.85 to be extremely reasonable.

### II. Chiron Financial Advisors

Chiron Financial Advisors was hired by First KT in January 2008 for a flat monthly fee. The terms of their engagement represent that they were retained to:

1. Calculate the going concern value of Debtors;

2. Opine on market rates for alternative financing;

3. Investigate insider transactions;

4. Advise First KT on the project's condition and the cost of repair;

5. Calculate the balance due under the notes;

6. Evaluate insurance claims; and

7. Opine on the feasibility of any proposed plans by Debtors.

For these services, Chiron was paid $25,000.00 per month for three months then $20,000.00 for the next five months for a total of $195,000.00.

Debtors' first proposed Plan was opposed by First KT. As a result, First KT and Debtors entered into negotiations which resulted in an Amended Plan that First KT supported. At the hearing on the Amended Plan, Debtors offered experts regarding the value of Debtors' assets on a going concern and liquidation basis; cash flow, projected revenues, occupancy rates and expenses; the costs to complete repairs to the properties and maintain them going forward; the market rates available for a financing of this type; and the feasibility of refinancing Debtors' plan obligations in two years.    None of these experts was Chiron.

Chiron does not keep time sheets nor does it generally bill clients by the hour. One of its representatives attempted to recreate the time each of the Chiron personnel spent on this file from memory and based on "his working in close proximity to others in the office." Similar to the legal professionals, the time was charted by task.

### A. Calculation of Debt

A large portion of Chiron's time (estimated at 120 hours) was spent calculating the balance due on the notes and the accrued interest due on the petition date. The Court considers this an administrative function of the lender not properly outsourced and charged to Debtors. The fees charged at the origination of a loan, as well as the interest earned throughout its life, are calculated to compensate the lender for the loan's administration.[14] The calculation of the debt due is the most basic of administrative functions. The determination of the amount due is a part of the lender's normal business operations falling under the umbrella of functions contemplated when the loan originates. Because the lender has already been compensated through closing fees and interest for this service, it is unreasonable for a lender to outsource this task and charge a borrower for its performance.

### B. Review of Insider Transactions

Chiron estimated that it spent 90 hours "auditing" Debtors' books for insider transactions. Chiron testified that it compiled a list of questionable transactions for research as possible preferential or fraudulent transfers. The list itemized checks by date, number, amount, and payee. The checks were identified by reviewing Debtors' check registers and bank statements. Chiron simply listed all known insiders or related parties receiving funds between November 2007 and May

---

[14] *In re Vest Associates*, 217 B.R. 696, 701 (Bankr.S.D.N.Y. 1998).

2008. Chiron did not discuss the transactions with Debtors, nor did it attempt to match the amounts received to invoices or payroll records. It did not discuss the list with First KT or its counsel. In short, other than drawing up a list of checks, no other work was preformed by First KT on potential voidable transfers. Given the testimony, Chiron's estimated 90 hours of "audit" time is excessive.

### C. Property Inspection

Chiron claimed over 55 hours of time was spent inspecting the properties and preparing a condition report. However, Chiron testified that it had no one with expertise in construction, and it was compelled to rely on third parties for this expertise. It is clear from First KT's expense request that the employment of other professionals (i.e. a construction expert) were instrumental in the preparation of the condition and repair plan for First KT.

Prepetition, Debtors' properties had incurred two separate casualty losses from a fire and Hurricane Katrina. Substantial work had been undertaken prepetition but costly repairs were still ongoing. Thus, the Court does not question the necessity of a construction expert. Nevertheless, the testimony offered by Chiron is absent any support that it possessed the necessary expertise to evaluate or estimate the condition of Debtors' property or repairs. Nothing in evidence supports that its efforts added to the available knowledge or protected the lender's position. It appears that Chiron merely accompanied other professionals to Debtors' properties and observed their inspections. The Court considers this effort to be duplicative and unnecessary.

### D. Market Interest Rates and Refinancing

Chiron claims to have addressed alternative financing and marketing options for Debtors but no evidence was offered to support this claim. Initially, First KT's position strongly supported a foreclosure on Debtors' properties. Failing that option, First KT sought to limit exclusivity in an

effort to present its own plan, one that heavily favored First KT at the expense of construction lien and unsecured claims. Nothing in the record or testimony indicates that First KT searched for a take out lender nor did its final position involve one. Chiron's representative at the hearing exhibited a rudimentary understanding of market financing not commensurate with the fees requested.

### E. Review of Feasibility and Financial Projections

Chiron also claims to have assisted First KT in the analysis of Debtors' plans and their financial projections. This task appears to have fallen to Mr. Overal, an MBA graduate with 2 years experience in the field. Mr. Overal's testimony revealed that he did little more than reformat Debtors' financial statements. He performed no financial audits on the properties, did not prepare any cash projections of his own, and offered no market research on occupancy or rental rates. In short, nothing in the evidence offered at hearing established that Chiron performed anything but the most basic of accounting analysis for First KT.

As with the construction projects, First KT appears to have retained separate financial experts and an appraiser to assist in the evaluation of Debtors' proposed plan, marketing, cash flow, rental and proposed occupancy rates.[15] As a result, Chiron's claim for these services is also duplicative and unnecessary.

The conclusion of the Court is further supported by the limited amount of time counsel for First KT spent with Chiron, and Chiron's notable absence at the confirmation hearing. The Court cannot find any justification for *Chiron's employment* much less a fee of $195,000.00. However,

---

[15] First KT seeks allowance of the following expenses, which will be allowed by the Court: $3,000 for appraisals; $3,853.76 for court reporters/deposition transcripts; $2,162.88 for a videographer; $7,700.00 for a financial expert; $987.50 for a construction expert; $14,054.25 for travel expenses; $1,746.76 for Chiron's expenses; and $4,224.30 for document reproduction.

giving Chiron some benefit of doubt, fees in the amount of $18,000.00 or $2,000.00.00 per month will be approved for the services it appears to have performed.

### III. Conclusion

As a result of the above findings, the Court awards First KT the sum of $388,277.85 in fees and $61,950.37 in costs. The Court will enter an Order in accordance with its ruling.

New Orleans, Louisiana, December 22, 2008.

Hon. Elizabeth W. Magner
U.S. Bankruptcy Judge